1
2
3
4
5
6
7
8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11

12   PEOPLE OF THE STATE OF CALIFORNIA )      Civil No. 09cv2233 AJB (PCL)
     EX REL. IMPERIAL COUNTY AIR      )
13   POLLUTION CONTROL DISTRICT;      )        **ORDER (1) DENYING PLAINTIFFS'**
     IMPERIAL COUNTY AIR POLLUTION    )        **MOTION FOR SUMMARY**
14   CONTROL DISTRICT; COUNTY OF      )        **JUDGMENT, (2) GRANTING**
     IMPERIAL,                        )        **FEDERAL DEFENDANTS' CROSS**
15                                    )        **MOTION FOR SUMMARY**
                    Plaintiff,        )        **JUDGMENT, AND (3) DENYING AS**
16   v.                               )        **MOOT INTERVENING DEFENDANTS'**
                                      )        **CROSS MOTION FOR SUMMARY**
17   UNITED STATES DEPARTMENT OF      )        **JUDGMENT**
     INTERIOR; KEN SALAZAR, SECRETARY ))
18   OF THE UNITED STATES DEPARTMENT  )        [Docs. 60, 63, 65]
     OF INTERIOR; UNITED STATES       ))
19   BUREAU OF RECLAMATION; MICHAEL   )
     L. CONNOR, COMMISSIONER, BUREAU  )
20   OF RECLAMATION,                  )
                                      )
21                  Defendants.       )
     _____)
22   METROPOLITAN WATER DISTRICT OF   )
     SOUTHERN CALIFORNIA; SAN DIEGO   )
23   COUNTY WATER AUTHORITY;          )
     IMPERIAL IRRIGATION DISTRICT;    )
24   COACHELLA VALLEY WATER           )
     DISTRICT,                        )
25
                 Intervening Defendants
26   _____

27

28

1

Presently before the Court are a motion for summary judgment filed by Plaintiffs[1] (Doc. 60), a cross motion for summary judgment filed by Federal Defendants[2] (Doc. 63), and a cross motion for summary judgment filed by Intervening Defendants[3] (Doc. 65). For the reasons set forth below, the Court (1) **DENIES** Plaintiffs' motion for summary judgment, (2) **GRANTS** Federal Defendants' cross motion for summary judgment, and (3) **DENIES AS MOOT** Intervening Defendants' cross motion for summary judgment.

## I.

## BACKGROUND

Plaintiffs filed this action against Federal Defendants challenging the final agency decision of the Secretary of the Interior approving the Colorado River Water Delivery Agreement ("CRWDA"). The CRWDA is one of numerous agreements governing the use and distribution of Colorado River water. Plaintiffs allege that the Secretary failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, by failing to consider the necessary information prior to executing the CRWDA. Plaintiffs request judicial review of the Secretary's decision under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Plaintiffs seek (1) a declaration that the Secretary violated NEPA and the CAA in executing the CRWDA and (2) an order immediately ceasing water deliveries under the void CRWDA.

---

[1] Plaintiffs are the Imperial County Air Pollution Control District (the "Air District") and the County of Imperial.

[2] Federal Defendants are the United States Department of the Interior; Ken Salazar, Secretary of the United States Department of the Interior; the United States Bureau of Reclamation; and Michael L. Connor, Commissioner, Bureau of Reclamation.

[3] Intervening Defendants are the Metropolitan Water District ("MWD"), San Diego County Water Authority ("SDCWA"), Imperial Irrigation District ("IID"), and Coachella Valley Water District ("CVWD").

The parties submitted copious briefing on the three instant motions.[4] Before discussing their various arguments, the Court finds it helpful to examine an overview of NEPA, as well as a brief history of Colorado River water apportionment in California leading up to the CRWDA.

## A.    NEPA Overview

NEPA is a procedural statute that requires federal agencies to consider the potential environmental impacts of their proposed actions and also guarantees broad public dissemination of relevant information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Importantly, NEPA exists to ensure a process, not any particular result. *Id.* at 350; *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996).

To ensure that federal agencies take the necessary "hard look" at environmental consequences prior to approving an action, NEPA requires the preparation of an environmental impact statement ("EIS").[5] 42 U.S.C.§ 4332(c); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). NEPA's procedures are set forth in regulations promulgated by the Council on Environmental Quality ("CEQ"), which are binding on all federal agencies. 40 C.F.R. § 1500.2 *et seq.*; *Anderson v. Evans*, 371 F.3d 475, 487 (9th Cir. 2002). The CEQ regulations prescribe the form of an EIS, including the evaluation of "all reasonable alternatives" to the proposed action and a "no action" alternative. 40 C.F.R. §§ 1502.14(a), 1502.14(d).

The CEQ regulations emphasize public disclosure and involvement. Specifically, they require publication in the *Federal Register* of a Notice of Intent to prepare an EIS, followed by a public "scoping" process. 40 C.F.R. § 1501.7. The lead agency then prepares a draft EIS and circulates it for

---

[4] The Court permitted the parties to exceed the usual page restrictions in their summary judgment filings. The resulting motion briefing exceeded 300 pages—not including attachments. Furthering the voluminosity, Plaintiffs have requested judicial notice of 54 additional documents. (Docs. 60-2, 75-4.) Intervening Defendants have requested judicial notice of 31 additional documents. (Docs. 65-4, 79.) Pursuant to Rule 201, a court may take judicial notice of adjudicative facts "not subject to reasonable dispute." Fed. R. Evid. 201(b). Facts are indisputable, and thus subject to judicial notice, only if they are either "generally known" under Rule 201(b)(1) or "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" under Rule 201(b)(2). To the extent these documents are judicially noticeable, the Court grants the requests.

[5] Although an EIS must contain a "reasonably thorough" discussion of an action's significant environmental consequences, the lead agency has considerable discretion in defining the scope of both the action and the environmental analysis. *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010); *Kleppe*, 427 U.S. at 406-07; *Churchill County v. Norton*, 276 F.3d 1060, 1076-79 (9th Cir.), *amended*, 282 F.3d 1055 (9th Cir. 2001).

comment from the public, appropriate state and local agencies, Indian tribes, cooperating agencies, and other federal agencies which have asked to comment. 40 C.F.R. §§ 1502.9(a), 1502.19, 1503. The comment period must be at least 45 days. 40 C.F.R. § 1506.10(c). Following the receipt of comments on a draft EIS, the lead agency prepares a final EIS, which must include a response to comments received on the draft.[6] 40 C.F.R. §§ 1502.9(b), 1503.4. The final EIS must also be circulated to the public and filed with the Environmental Protection Agency ("EPA"), and a notice of the final EIS must be published in the *Federal Register*. 40 C.F.R. §§ 1502.19, 1506.9, 1506.10(a).

In some situations, even after the final EIS is prepared, an agency must prepare a ***supplemental*** EIS if (1) the agency makes substantial changes in the proposed action relevant to environmental concerns, or (2) there are significant new circumstances or information bearing on the proposed action that are relevant to environmental concerns. 40 C.F.R. § 1502.9(c)(1); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 372 n.16 (1989). The CEQ regulations do not dictate how agencies determine whether a change in the proposed action, circumstances, or new information rises to the level of significance that would require a supplemental EIS. Courts, however, have approved agency use of "supplemental information reports" or similar documents to determine the environmental significance of such changes or new information. *Id.* at 383-85; *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997). An agency's decision whether to prepare a supplemental NEPA analysis does not require public disclosure or comment. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000).

Of particular import here, the CEQ regulations specifically permit (and in some circumstances require[7]) agencies to incorporate documents by reference into an EIS. *See* 40 C.F.R. § 1502.21; *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 99 n.12 (1983); *City of Sausalito v. O'Neill*, 386 F.3d 1186,

---

[6] In responding to comments, the agency may modify alternatives including the proposed action; develop and evaluate alternatives not previously given serious consideration by the agency; supplement, improve, or modify its analyses; make factual corrections; or explain why comments do not warrant further agency response. 40 C.F.R. § 1503.4(a)(1)-(5).

[7] Under 40 C.F.R. § 1502.21, "Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference."

09cv2233

1214 (9th Cir. 2004); *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002) ("CEQ procedures allow agencies to incorporate by reference certain materials to cut down on the bulk of an EIS . . . .").

**B.      Colorado River Apportionment**

Water from the Colorado River is apportioned among seven western states and Mexico. It is governed by a complex series of laws dating back nearly a century. Administrative Record ("AR") 2375, 2431-32. Under the 1928 Boulder Canyon Project Act, California's use of the Colorado River is limited to no more than 4.4 million acre-feet per year ("MAFY") and one-half of any surplus water available. Pub.L. 642-70, § 4(a) 45 Stat. 1057 (Dec. 21, 1928); *see also* 43 U.S.C. § 617c(a); AR 2375, 2431-33, 2435. The Secretary of the Interior manages Colorado River deliveries and determines when surplus conditions occur—*i.e.,* when California may receive more than its 4.4 MAFY entitlement. Pub. L. No. 90-537, § 602; AR 19799-800.

In 1931, the principal users of California's apportionment entered into the Seven Party Agreement, which allocated water among the California parties by priority, but did not quantify the exact amount that each agricultural contractor was individually entitled to receive in the first three priorities. AR 2375, 37197; *see generally* 65 Fed. Reg. 48531, 48532 (Aug. 8, 2000); AR 2375, 2433, 37197-202. The first four priorities under the Seven Party Agreement allocated a total of 4.4 MAFY, which equals California's basic apportionment without surplus water, but the Agreement apportioned a total of 5.362 MAFY among the signatories.  AR 37197-98 (art. I).[8]

California lawfully used more than 4.4 MAFY for several decades, since Arizona and Nevada underutilized their full apportionments and surplus water was available. AR 9749, 9835. But when Arizona and Nevada began increasing their water use, California's continued access to more than 4.4 MAFY was threatened. AR 9749, 9835. As unused apportionments dwindled, pressure mounted for IID to reduce its water use under its unquantified allocation as a potential solution to future water shortages. AR 9749, 9835. In particular, MWD and Coachella alleged that IID was wasting water through inefficient irrigation practices and sought to compel IID to reduce its water use and thereby make more

---

[8]  Under the priority system, MWD was only entitled to more than 550,000 AFY if the agricultural agencies holding the first three priorities used less than 3.85 MAFY, or when the Secretary declared a surplus condition or made unused apportionments of Arizona or Nevada available for use in California. *Id.*

1   water available to them. Negotiations commenced to quantify the top three agricultural priorities to

2   Colorado River water and to reduce California's use to its 4.4 MAF normal-year apportionment. AR

3   9749, 9835, 9837.

4          The resulting settlement is referred to as the QSA, although it took 35 agreements, including the

5   Quantification Settlement Agreement itself, to fully implement all of the aspects of the settlement

6   among all of the interested parties. The QSA was approved in October 2003. The main state agreements

7   include implementing water conservation programs in IID's service area and transferring conserved

8   water from IID to Coachella, MWD, SDCWA, and others. AR 1005-316. The settlement also includes

9   the water agencies' substantial commitment of mitigation funds toward the environmental impacts of the

10  QSA and associated water transfers. AR 1005, 1227-45.

11  **C.     The CRWDA**

12         The main federal agreement under the QSA—and the only federal action challenged by

13  Plaintiffs in this case—is the CRWDA. Because implementing the QSA and related water transfer

14  contracts required the Secretary's approval, the Secretary and real parties in interest negotiated an

15  Implementation Agreement ("IA"), under which the Secretary agreed to deliver Colorado River water in

16  accordance with the QSA terms. The IA was subsequently replaced by the CRWDA, which provides the

17  necessary federal authorization for specified water deliveries to IID, Coachella, MWD, and SDCWA

18  and implements the agreed-upon water budgets and quantifications of priorities set forth in the QSA and

19  related transfer agreements. AR 36-40 (arts. 1-5). Among other provisions, the CRWDA effectuates the

20  changes in the amount and locations of deliveries of approximately 400,000 AFY. AR 36, 47.

21         The NEPA review for the Secretary's approval of the CRWDA was contained in the IA EIS.[9]

22  Its principal focus was on potential direct effects of the CRWDA on the main stem of the Colorado

23  River, but the document also considered indirect effects of that action in the Imperial Valley.

24  **D.     The Salton Sea**

25         One significant obstacle to the QSA was the Salton Sea. The body of water was becoming a

26  hyper-saline lake without the water transfers, but any conservation of water in the IID service area could

27

28         [9] For purposes of this order, the Court hereinafter refers to the IA Draft EIS and the IA Final EIS
    as simply the "Draft EIS" and the "Final EIS," respectively. Environmental reviews for other projects
    are referred to by more specific names.

1   potentially accelerate the Sea's ongoing decline, causing increased salinity and decreasing elevation

2   levels. AR 1516-17. This caused tensions between the goal of conserved water transfers, which could

3   reduce inflows to the Salton Sea, and the goal of developing a Salton Sea restoration plan.

## II.

## LEGAL STANDARD

6           The judicial review provisions of the APA, codified at 5 U.S.C. §§ 701-706, provide the waiver

7   of sovereign immunity and right to review applicable to the NEPA and CAA claims in this action. The

8   APA provides "the sole means for testing the legality of federal agency action" when an agency is

9   alleged to have violated a federal law that confers no private right of action or whose citizen suit

10  provision is not applicable to the particular dispute. *Clouser v. Espy*, 42 F.3d 1522, 1528 n.5 (9th Cir.

11  1994) (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990)). Because NEPA itself provides no

12  private right of action, a federal agency's compliance with NEPA is reviewable only under the APA.

13  *Churchill County*, 276 F.3d at 1070. Similarly, "challenges to agency determinations falling under the

14  general provisions of the Clean Air Act are properly analyzed under the APA rather than the citizen suit

15  provision of the Clean Air Act." *Envt'l Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1023

16  (E.D. Cal. 2000).

17          The standard of review under the APA is deferential to the agency. Section 706(2) of the APA

18  grants a court the power to set aside agency action, findings, and conclusions found to be "arbitrary,

19  capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The

20  scope of judicial review under the "arbitrary and capricious" standard is narrow, and the court is not to

21  substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*

22  *Co.*, 463 U.S. 29, 43 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

23  In reviewing the adequacy of an EIS, the Ninth Circuit follows a "rule of reason that asks whether an

24  EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental

25  consequences." *City of Sausalito*, 386 F.3d at 1206 (quotation omitted). To determine whether an EIS is

26  adequate, courts make "a pragmatic judgment whether the [EIS's] form, content and preparation foster

27  both informed decision-making and informed public participation." *Laguna Greenbelt*, 42 F.3d at 523.

28  "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the

1   environmental impact of its actions and that its decision is not arbitrary and capricious." *Balt. Gas*, 462

2   U.S. at 97-98. "[T]he standard mandates judicial affirmance if a rational basis for the agency's decision

3   is presented . . . even though [a court] might otherwise disagree." *Environmental Defense Fund, Inc. v.*

4   *Costle*, 657 F.2d 275, 283 (D.C. Cir. 1980).[10]

5        Summary judgment under Federal Rule of Civil Procedure 56(a) is appropriate when there is no

6   genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.

7   Fed R. Civ. P. 56(a). Under the APA, the reviewing court does not take evidence or make findings of

8   fact. *Cronin v. United States Dep't of Agric.*, 919 F.2d 439, 443 (7th Cir. 1990). When reviewing

9   administrative action under the APA on a motion for summary judgment, there are no disputed facts that

10  the court must resolve. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985); *Home Builders*

11  *Ass'n of Northern Cal. v. U. Fish and Wildlife Serv.*, 529 F. Supp. 2d 1110, 1117 (N.D. Cal. 2007).

12  Rather, "the function of the district court is to determine whether or not as a matter of law the evidence

13  in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co.*,

14  753 F.2d at 769.

15                                          **III.**

16                                     **DISCUSSION**

17        Plaintiffs' motion for summary judgment asserts that Federal Defendants violated NEPA and

18  the CAA in approving the CRWDA. As noted above, Plaintiffs seek a declaration to that effect, as well

19  as an order immediately ceasing water deliveries under the CRWDA. In their cross motion for summary

20  judgment, Federal Defendants argue that Plaintiffs do not have standing to bring their claims and that

21  regardless, Plaintiffs' NEPA and CAA claims fail on the merits. Intervening Defendants' cross motion

22

23

24        [10] Plaintiffs disagree with this standard of review, claiming there is no deference owed to the
    agency when applying uncontested facts in the record to test NEPA compliance, and that the proper
25  standard instead is "reasonableness." It is true that the Ninth Circuit has applied a reasonableness
    standard to review an agency's threshold determination that an action is not subject to NEPA. *See Kern*
26  *v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1070 (9th Cir. 2002). However, the situation here is far
    beyond such a threshold determination: the agency prepared the Draft and Final EIS, and the Secretary
27  relied on it approving the CRWDA. As explained above, those actions are appropriately reviewed under
    the deferential "arbitrary and capricious" standard. Regardless, as Federal Defendants note, the
28  difference between the "arbitrary and capricious" and "reasonableness" standards "is not of great
    pragmatic consequence." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 n.23 (1989).

1   for summary judgment raises two additional defenses of laches and issue exhaustion, in addition to

2   arguing that Plaintiffs' claims fail on the merits.

3          Below, the Court first addresses the issue of standing and then addresses the merits of Plain-

4   tiffs' NEPA claim. Because these grounds are fully determinative, the Court need not analyze Plaintiffs'

5   CAA claim or the additional issues raised in Intervening Defendants' cross motion for summary

6   judgment.

7   **A.      Standing**

8          Federal Defendants argue that Plaintiffs have failed to establish their standing to sue. With

9   respect to each claim and each type of relief sought, Plaintiffs must satisfy the injury, causation, and

10  redressability requirements for constitutional standing. Specifically, Plaintiffs must show that (1) they

11  have suffered an "injury in fact" that is concrete and particularized, and also "actual and imminent, not

12  conjectural or hypothetical"; (2) the injury is "fairly traceable to the [Federal Defendants'] challenged

13  action"; and (3) it is likely, as opposed to merely speculative, that "a favorable judicial decision will

14  prevent or redress the injury." *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1148-49 (2009); *see also*

15  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

16         Standing presents less of a hurdle when the plaintiff seeking judicial review is the object of the

17  challenged agency action. But when, as here, the challenged agency action neither requires nor forbids

18  any action on the plaintiff's part, standing is more difficult to establish. *Summers*, 129 S. Ct. at 1149;

19  *Defenders of Wildlife*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government

20  action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more

21  difficult' to establish."). Here, neither Imperial County nor the Air District is regulated under the

22  CRWDA. Neither Plaintiff claims a right to divert Colorado River water, and neither has a contract with

23  the Secretary to receive deliveries of Colorado River water from federal facilities. Neither claims to own

24  land beneath or adjacent to the Salton Sea. Rather, Plaintiffs allege that implementation of the CRWDA

25  and the QSA will cause injury to the public health, the environment, and fish and wildlife habitat

26  through accelerated salinization of the Salton Sea and increased emissions resulting from greater

27  exposure of Salton Sea shoreline.

28

According to Federal Defendants, Plaintiffs fail the "injury in fact" requirement for standing because these alleged injuries are to third parties or the public at large, rather than to any concrete or particularized interest specific to Plaintiffs. In general, a state or local government may sue to protect three general types of interests: (1) sovereign interests, such as the authority to enforce civil and criminal codes; (2) proprietary interests, such as land ownership; and (3) quasi-sovereign interests relating to the general welfare of its populace under the doctrine of *parens patriae*. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601-02 (1982). Of these three categories, only quasi-sovereign interests would seem to be implicated here, since Plaintiffs are not alleging proprietary or sovereign interests. However, in lawsuits against the federal government, a state does not have standing to protect quasi-sovereign *parens patriae* interests because, with respect to the relationship between citizens and the federal government, the United States, and not the state, is presumed to represent the interests of the citizens as *parens patriae*. *Id.* at 610 n.16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)); *Nevada v. Burford*, 918 F.2d 854, 857-58 (9th Cir. 1990).[11] Federal Defendants conclude that by relying on *parens patriae* and failing to assert any concrete or proprietary interests, Plaintiffs' allegations form an insufficient basis for standing against the federal government. *See Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir. 1976); *see also City of Sausalito*, 386 F.3d at 1197 ("As a municipality, Sausalito may not simply assert the particularized injuries to the 'concrete interests' of its citizens on their behalf").

Plaintiffs respond that they have standing to bring the CAA action because the Air District has authority to bring a civil action on behalf of California citizens to enforce CAA requirements. *See* Cal. Health and Safety Code § 41513; *Massachusetts v. EPA*, 549 U.S. 497, 518, 526 (2007); *Davis v. EPA*, 348 F.3d 772, 778 (9th Cir. 2003); *People of the State of Cal. ex rel. State Air Res. Bd. v. Dept. of Navy*, 431 F. Supp. 1271, 1280-1281 (N.D. Cal. 1997). However, as Federal Defendants note, Plaintiffs cannot suddenly recharacterize their Complaint as an enforcement action pursuant to the Air District's

---

[11] As the Supreme Court reiterated in *Snapp*, "[w]hile the State, under some circumstances, may sue . . . for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae*." *Snapp*, 458 U.S. at 610 n.16. These limitations apply to counties, which are subdivisions of the state under California law. *See* Calif. Const. Art. XI § 1(a) ("The State is divided into counties which are legal subdivisions of the State."); *City of Rohnert Park v. Harris* 601 F.2d 1040, 1044 (9th Cir. 1979).

1    enforcement authority. Plaintiffs did not plead this case as an enforcement action, but as one for review

2    of final agency action under the APA.

3        To sue the federal government, Plaintiffs must establish an applicable waiver of sovereign

4    immunity. The only waiver identified in the Complaint is the APA waiver allowing for review of final

5    agency action, 5 U.S.C. §§ 702-04, but that waiver does not apply to the state enforcement action

6    Plaintiffs now assert.[12] The Court therefore agrees with Federal Defendants that Plaintiffs cannot

7    demonstrate standing by characterizing their claim as an enforcement action rather than a review of final

8    agency action. Plaintiffs thus lack standing to bring a CAA action.

9        With regard to NEPA, Plaintiffs argue that they satisfy the three elements for "procedural

10   standing": (1) Federal Defendants violated procedural rules, (2) these rules protect Plaintiffs' concrete

11   interests, and (3) it is reasonably probable that the challenged action will threaten their concrete

12   interests. *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 969-970 (9th Cir.

13   2003). Even under this standard, however, Plaintiffs still have not established their concrete interests

14   outside of the *parens patriae* doctrine—which, as explained above, cannot serve as the basis for

15   standing in a suit against the federal government.[13]

16

17       [12] Plaintiffs do not cite to 42 U.S.C. § 7418, which does provide a limited waiver of sovereign

18   immunity from such actions. However, as Federal Defendants point out, even if Plaintiffs had cited it,
     that waiver likely would not extend to the CAA conformity provision at issue. Section 7418 is limited to

19   enforcement of requirements regarding control and abatement of air pollution "in the same manner, and
     to the same extent as any nongovernmental entity." 42 U.S.C. § 7418(a). However, the conformity

20   requirement is applicable only to federal agencies. *Id.* § 7506(a). Thus, it does fall within the terms of
     the waiver, which must be interpreted strictly. *See Hancock v. Train*, 426 U.S. 167, 179 (1976); *see also*

21   *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (interpreting similar provision in Clean
     Water Act).

22       The Act's citizen suit provision, 42 U.S.C. § 7604, would also be inapplicable. Courts have
     routinely held that the conformity provision is not subject to enforcement as a citizen suit, but rather that

23   an agency's compliance with the conformity requirement is subject to review in an action under the
     APA. *City of Yakima v. Surface Transportation Bd.*, 46 F. Supp. 2d 1092, 1098 (E.D. Wash. 1999).

24       [13] Specifically, as Federal Defendants observe, the declarations Plaintiffs submitted reflect the
     type of *parens patriae* interests that a state has in the general well-being of its populace. For example,

25   the Cordova Declaration asserts that the County has interests in "the economic and healthful wellbeing
     of its citizens" (Cordova Decl. ¶ 8), in the economy of the County and its agricultural industry (*id.* ¶ 9),

26   in the protection of public health, safety and welfare of its citizens (*id.* ¶ 10), and in the recreational and
     aesthetic enjoyment of its residents and visitors in the Salton Sea. *Id.* ¶ 12. The Poiriez Declaration

27   similarly complains of impacts from PM10 emissions on Imperial County residents, businesses, and
     agriculture. (Poiriez Decl. ¶¶ 23-26.) *See, e.g.*, *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d

28   261, 267 (D.C. Cir. 2002) (city's interests in exposure of its citizens to increased air and water
     pollution); *Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990) (state's interest in its tourist industry);

1    The Court therefore concludes that Plaintiffs have failed to establish their standing because the

2    injuries they allege do not form a basis to sue the federal government. The Court GRANTS Federal

3    Defendants' cross motion for summary judgment on this ground and consequently DENIES Plaintiffs'

4    motion for summary judgment.

5    **B.    NEPA**

6    Even though the Court finds Plaintiffs' claims fail in their entirety for lack of standing, it

7    nonetheless wishes to address the merits of Plaintiffs' NEPA claim. In doing so, the Court is mindful of

8    the deferential "arbitrary and capricious" standard of review. Because NEPA imposes only procedural

9    requirements, "[a] court must avoid passing judgment on the substance of an agency's decision."

10   *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004).

11   Plaintiffs make a number of arguments that Federal Defendants violated NEPA in executing the

12   CRWDA and approving the QSA. The Court groups Plaintiffs' arguments into the following categories:

13   (1) improper segmentation, tiering, and incorporation by reference; (2) post-EIS project changes; (3)

14   disclosure of Salton Sea impacts; (4) analysis of growth-inducing impacts; and (5) adequacy of

15   mitigation. Each is addressed below.

16   ***1.    Improper Segmentation, Tiering, and Incorporation by Reference***

17   Plaintiffs claim Federal Defendants impermissibly "segmented" the impact analysis of the

18   CRWDA, water transfers, and other QSA actions into a number of NEPA documents, rather than

19   considering them together. As a result, there was no comprehensive review of the CRWDA's impacts in

20   connection with the water transfers and other QSA components, which were analyzed under separate

21   environmental studies. According to Plaintiffs, this segmented approach thwarted informed

22   decisionmaking and public participation, in violation of NEPA. Plaintiffs also claim Federal Defendants

23   impermissibly "tiered" the Final EIS to non-NEPA documents.

24   Under NEPA, "proposals or parts of proposals which are related to each other closely enough to

25   be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. §

26

27   *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979) (city's interest in the economic
     wellbeing of inhabitants and businesses); *United States v. W.R. Grace*, 185 F.R.D. 184, 189 (D. N.J.

28   1999) (township's claimed interest in the "health, safety and welfare of Township residents"); *see also*
     *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602-3 (1982) (describing a state's *parens*
     *patriae* interest generally).

1   1502.4(a). Agencies must analyze actions in a single NEPA study to prevent "dividing a project into

2   multiple 'actions,' each of which individually has an insignificant environmental impact, but which

3   collectively have a substantial impact." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1305 (9th

4   Cir. 2003), citing *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985). Thus, a single NEPA study

5   may be required for distinct projects when there is a single proposal governing the projects, or when the

6   projects are "connected," "cumulative," or "similar" actions under the CEQ regulations. *Native*

7   *Ecosystems Council v. Dombeck*, 304 F.3d 886, 893-94 (9th Cir. 2002). Federal Defendants assert that

8   here, that single comprehensive study is the Final EIS.

9          As noted above, the Final EIS is the environmental document that provided the NEPA review

10  for the CRWDA. But in considering the indirect effects of the proposed IA, it "incorporated by

11  reference" information from other QSA-related environmental documents, including: (1) the "Transfer

12  EIR/EIS," a joint federal and state document which analyzed the transfer of Colorado River water from

13  IID to SDCWA, CVWD, and MWD; and (2) the "QSA PEIR," a state California Environmental Quality

14  Act ("CEQA") document prepared by the water agencies for the broader QSA program.

15         Federal Defendants assert that there was no improper segmentation because, by incorporating

16  by reference these other environmental studies, the Final EIS appropriately considered all direct and

17  indirect impacts while avoiding redundancy. It considered the potential impacts to the Salton Sea and

18  Imperial Valley caused not only by the IA, but also by the related water transfers and other QSA actions.

19  Both the Final EIS (beginning at AR 2445) and the Transfer EIR/EIS (beginning at AR 4960) devoted

20  specific sections to the scope and relationships of these documents to each other to address concerns

21  regarding segmentation. The record also supports that the Final EIS was "broader in scope" than the

22  Transfer EIR/EIS. AR 3070. The Final EIS is thus a ***comprehensive*** analysis that—through the use of

23  incorporation by reference—takes the necessary "hard look" at the broad range of potential environmen-

24  tal impacts. Recognizing the "considerable discretion afforded agencies in defining the scope of an

25  EIS," *Churchill County*, 276 F.3d at 1076, the Court agrees with Federal Defendants that Plaintiffs have

26  not demonstrated any impermissible segmentation in violation of NEPA.

27         Plaintiffs' claim of improper incorporation by reference likewise fails. As noted above, the

28  CEQ regulations permit incorporation by reference, provided the incorporated material is cited in the

1    EIS and "its content briefly described." 40 C.F.R. § 1502.21. Here, the Final EIS cited to and briefly

2    described the content of the material cited.[14] The CEQ regulations also require that material incorporated

3    by reference must be "reasonably available for inspection by potentially interested persons." 40 C.F.R. §

4    1502.21. Here, the Final EIS informed the public where copies of the Transfer EIR/EIS and other CEQA

5    documents could be obtained. AR2453. Additionally, the comment periods for the Draft EIS, the Draft

6    Transfer EIR/EIS, and the Draft QSA EIR substantially overlapped. AR 4977. Thus, not only were these

7    incorporated materials "reasonably available for inspection," but they were also simultaneously

8    available for public comment.  As a practical matter, the Court notes that the Final EIS is more than 700

9    pages long. Incorporating the findings of the Transfer EIR/EIS as well as the relevant findings of the

10   QSA PEIR and the Coachella Valley Water Management Plan PEIR certainly had the effect of

11   "cut[ting] down on bulk." 40 C.F.R. § 1502.21. Incorporation of these documents did not "imped[e]

12   agency and public review of the action." *Id.* The Court therefore finds that the Final EIS appropriately

13   incorporated by reference material from the other environmental studies, in compliance with NEPA.[15]

14        Plaintiffs similarly claim that Federal Defendants further circumvented NEPA's purpose by

15   tiering the Final EIS to non-NEPA documents. *See* 40 C.F.R. § 1502.20; AR2445-2446, 2453.  Federal

16   Defendants maintain that there was no improper tiering. The Final EIS stated that "[t]his EIS tiers to and

17   incorporates by reference the information contained in the documents listed below," and then identified

18   the QSA PEIR, the Transfer EIR/EIS, the Coachella Valley WMP PEIR, as well as completed EIS/EIRs

19   on canal lining projects, water conservation projects, and other projects. AR 2453-54. However, the

20

21        [14] *See, e.g.*, AR2469-70, 2478-79 (citing and describing Transfer EIR/EIS's description of
     potential IID water conservation measures); 2544, 2554, 2568 (citing and describing Transfer EIR/EIS
22   data and analysis on hydrology and water quality impacts on the Salton Sea); 2599-2600 (same with
     respect to potential impacts of IID water conservation measures on biological resources at the Salton
23   Sea); 2729-32 (same with respect to air quality and the Salton Sea); 2575, 2599-2600 (same with respect
     to IID's proposed Salton Sea Habitat Conservation Strategy ("SSHCS")).

24

25        [15] Plaintiffs make much out of a discrepancy in estimates of exposed Salton Sea shoreline
     between the IID-certified and U.S. Bureau of Reclamation versions of the Transfer EIR/EIS. However,
26   Federal Defendants demonstrate that the underlying modeling and data displayed in the draft Transfer
     EIR/EIS (as subsequently certified by IID as a final EIR) and Reclamation's Transfer EIR/EIS were the
27   same for Salton Sea elevation, surface area, and salinity for each alternative. The documents are based
     on the same modeling. *See* AR5032; 12292-93, 12298, 12319. Using this same modeling, both also
28   projected that the increase in exposed shoreline at the Salton Sea under baseline or No Action conditions
     would be 16,000 acres by 2077. AR5430, 5528; 12298. Thus, the basic data are the same.

1    Court agrees with Federal Defendants that the actual use of the NEPA/CEQA documents in the Final

2    EIS demonstrates that the Bureau of Reclamation effectively incorporated them by reference rather than

3    tiering to them. In each instance, the Final EIS summarized the relevant data and analysis from the other

4    NEPA or CEQA document, and referred the reader to the source document for further details, as

5    required by 40 C.F.R. § 1502.21. The Court concludes that Plaintiffs have not demonstrated Federal

6    Defendants violated NEPA by impermissible tiering.

7            The Court therefore DENIES Plaintiffs' motion for summary judgment and GRANTS Federal

8    Defendants' cross motion for summary judgment, with regard to the allegations of improper segmenta-

9    tion, tiering, and incorporation by reference.

10           **2.      *Post-EIS Project Changes***

11           Plaintiffs claim Federal Defendants deprived the public of the opportunity to comment on key

12   project changes that occurred between the filing of the Final EIS and the signing of the CRWDA.

13   Plaintiffs assert that a supplemental analysis and comment period were required to examine the potential

14   impacts brought about by these changes. For example, the sale of the Salton Sea's mitigation water was

15   not analyzed in the Final EIS, but it was nonetheless included in the subsequent CRWDA.

16           To address all new information and project changes occurring after the Final EIS was issued,

17   and to assess whether they required preparation of a supplemental EIS, Federal Defendants prepared an

18   "Environmental Evaluation." The Environmental Evaluation considered each change to the proposed

19   action since the filing of the Final EIS. It concluded that these changes fell within the range of impacts

20   already analyzed in the Final EIS and were therefore minor, and that the preparation of a supplemental

21   Final EIS was not required. AR 245.

22           Plaintiffs, however, argue that the Environmental Evaluation was not a proper means of

23   determining whether a supplemental EIS was required to assess the changes to the CRWDA.   The Court

24   is not convinced. The Ninth Circuit has upheld the use of non-NEPA documents, such as memoranda of

25   record or supplemental information reports, for the limited purpose of determining whether new

26   information or changed circumstances require the preparation of a supplemental EIS. *See Idaho Sporting*

27   *Congress v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000) (citing cases). Federal Defendants used the

28

1   Environmental Evaluation for that specific and limited purpose here. Further, as noted above, the CEQ

2   regulations do not dictate *how* an agency determines whether a supplemental analysis is required, and

3   that decision does not require public disclosure or comment. *Friends of the Clearwater v. Dombeck*, 222

4   F.3d 552, 560 (9th Cir. 2000).

5           The record supports that the potential environmental impacts of the CRWDA were properly

6   disclosed to the public. The Final EIS disclosed the full range of potential impacts of its proposed

7   action, and Federal Defendants appropriately concluded that changes to water delivery schedules in the

8   final CRWDA were not significant and that a supplemental EIS was not necessary. As documented in

9   the Record of Decision, the Secretary's approval of the CRWDA was based on both the Final EIS and

10  the Environmental Evaluation, and thus fully complied with NEPA. AR 2-3 & n.3, 9.

11          The Court concludes that the Secretary did not violate NEPA in this regard. The Environmental

12  Evaluation properly considered post-EIS project changes, and the decision not to prepare a supplemental

13  EIS passes muster under the deferential standard of review. The Court therefore DENIES Plaintiffs'

14  motion for summary judgment and GRANTS Federal Defendants' cross motion for summary judgment

15  on this ground.

16           **3.**     ***Disclosure of Salton Sea Impacts***

17          In a lengthy argument, Plaintiffs contend that the Final EIS did not adequately analyze or

18  disclose the potential impacts of reduced flows to the Salton Sea from IID conservation actions. The

19  record, however, seems to indicate otherwise.

20          As Federal Defendants respond, the Bureau of Reclamation properly considered potential

21  impacts of its proposed action on the Salton Sea. Importantly, the Transfer EIR/EIS thoroughly

22  considered these issues, and that detailed analysis was incorporated by reference into the Final EIS.[16]

23  

---

24       [16] The Transfer EIR/EIS examines in great detail the potential hydrologic impacts of
the proposed IID/SDCWA water transfer and conservation measures on Imperial County and the

25  Salton Sea. *See* AR 5142-45, AR 5163-72. In fact, the Transfer EIR/EIS includes more than
thirteen pages of discussion of the hydrologic effects of the proposed project on various aspects of

26  the Salton Sea, including water quantity, water quality, selenium concentrations and sediment
quality. *Id.* It includes graphs showing the proposed project's potential effects on the Sea's salinity,

27  surface elevation, and surface area. AR 5164. Finally, it contains tables and graphs depicting the
impact that each of the five alternatives considered would have on the Sea's volume and salinity,

28  AR 5166-67, and it provides a visual illustration of the proposed project's effects on the overall

1   The Court agrees that, despite their multi-faceted argument regarding Salton Sea impacts, the heart of

2   Plaintiffs' concern rests on the premise that the Final EIS should not have considered data and analysis

3   from other environmental documents, particularly the Transfer EIR/EIS. However, for the reasons

4   discussed above, that argument fails.

5       In addition to incorporating Salton Sea–related material from other documents, the Final EIS

6   itself directly addressed potential impacts to the Salton Sea.[17] In assessing potential Salton Sea impacts,

7   the Final EIS considered the maximum transfer of 300 KAFY from IID to San Diego so that the greatest

8   potential impact from that proposed transfer and associated conservation measures could be described

9   and analyzed. AR 2567.

10      Plaintiffs also challenge the use of what they dub a "hypothetical future doomsday scenario"

11  baseline that did not consider the Salton Sea's current elevation and salinity levels. They claim this

12  hypothetical baseline was contrived to avoid revealing the project's substantial effects on the Salton

13  Sea's elevation and salinity. However, the use of a current conditions "baseline" is not a legal require-

14  ment under NEPA. *Am. Rivers v. Fed. Energy Reg. Comm'n*, 201 F.3d 1186, 1195 n.15 (9th Cir. 1999).

15  Here, the Bureau of Reclamation compared its action alternative to the No Action baseline (*i.e.*, future

16  conditions with the project versus future conditions without the project). This is consistent with the CEQ

17  regulations (40 C.F.R. § 1502.14(d)), and especially appropriate here, given the established ongoing

18

19  ————————————————————

20  water balance of the Sea. AR 5170. By summarizing and incorporating this extensive discussion
    by reference, the Final EIS thoroughly considered impacts of the proposed action on the Salton Sea.

21      [17] For example, the Final EIS hydrology section (Chapter 3) includes a subsection analyzing the
    hydrologic effects of the proposed project on the Salton Sea. *See* AR 2575. The Final EIS notes that,

22  "[w]ith implementation of the IA and QSA, IID would undertake conservation actions that have the
    potential to reduce inflows to the Salton Sea." *Id.* It adds: "[d]epending on how the conservation is

23  accomplished, the impact on inflows from IID could range from essentially no change . . . to a reduction
    of as much as about 300 KAFY." *Id.* If indeed Salton Sea inflows are reduced by 300 KAFY, the Final

24  EIS outlines, salinity levels in the Sea could rise as high as 163,500 mg/L (from the current level of
    44,000 mg/L) by 2076, the end of the 75-year study period. *Id.*; AR 2554. Under the No Action

25  alternative, by contrast, salinity in the Sea is expected to increase to 86,000 mg/L over the same period.
    AR 2554. Meanwhile, fish are not likely to survive once salinity levels surpass 60,000 mg/L, which the

26  Final EIS predicts will happen by 2023 even under the No Action alternative, *i.e.*, without the QSA or
    transfers. *Id.* Over the same 75-year period, the Final EIS notes, the surface elevation of the Sea could

27  decrease to about -250 feet (from a current elevation of -228 feet) under the "maximum impact
    scenario"—reduced inflows of 300 KAFY. AR 2554; AR 2575. Under the No Action

28  alternative, the surface elevation is expected to drop to -235 feet over the same period. AR 2554.

09cv2233

1   trend of increased salinity and declining water surface elevation. AR 2544-5; AR 5111-17.[18] Because the

2   Salton Sea's salinity and elevation will change ***without*** the project, the Court agrees that the most

3   accurate way to assess the project's impacts is to compare it to a future baseline, as Federal Defendants

4   did here. By contrast, comparing it to a current conditions baseline would not factor in changes that will

5   occur regardless of the project—effectively overstating the project's impacts. Consequently, the Court is

6   not convinced by Plaintiffs' baseline argument. In any event, the Transfer EIR/EIS did consider current

7   conditions, including current elevation and salinity as of 2002, in developing the description of baseline

8   conditions for the Salton Sea. AR 4044-47.

9        The record reflects that by properly incorporating material from the Transfer EIR/EIS and other

10   environmental reports, as well as including analysis in the Final EIS itself, Federal Defendants have

11   taken the necessary "hard look" at the CRWDA's potential impacts to the Salton Sea.  The Court

12   therefore DENIES Plaintiffs' motion for summary judgment and GRANTS Federal Defendants' cross

13   motion for summary judgment on this issue.

14        ***4.     Growth-Inducing Impacts***

15        Plaintiffs assert that the Final EIS failed to analyze the growth-inducing land use impacts of the

16   increased delivery of water to the MWD and SDCWA service areas. NEPA requires that an EIS

17   consider "growth inducing effects and other effects related to induced changes in the pattern of land use,

18   population density or growth rate, and related effects on air and water and other natural systems,

19   including ecosystems." 40 C.F.R. §§ 1502.16 40, 1508.8(b). Consideration of growth-inducing effects

20   furthers NEPA's information and public awareness goals. *City of Carmel-by-the-Sea v. United States*

21   *DOT*, 123 F.3d 1142, 1162 (9th Cir. 1997).

22        As Plaintiffs acknowledge, the Final EIS concluded that "[n]o aspects of the IA . . . would alter

23   land uses in the MWD service area . . . and no changes to population or housing are expected as a result

24   of the IA [CRWDA predecessor]." AR:2630; AR:2667. The Final EIS further concluded that the

25   "reliability of SDCWA's water supply would increase under the IA, although this would not lead to

26

27        [18] The Transfer EIR/EIS provides an extensive discussion of the methodology used for projecting
future salinity and elevation changes, including the use of Reclamation's Salton Sea Accounting Model.

28   AR 5055-5061, 5142-5144.

1    changes in land use within the SDCWA service area . . . and no changes to population or housing are

2    expected." AR:2630; *see also* AR:2667. Plaintiffs assert, however, that this conclusion was wrong.

3         Plaintiffs may disagree with the conclusion that the proposed action would not affect popula-

4    tion, housing, or employment in San Diego, but that alone does not constitute a NEPA violation. What

5    matters instead is that the Final EIS analysis was reasonable and supported by the record. Here, the Final

6    EIS's sections on land use and socioeconomic impacts included analyses of growth management and the

7    growth-inducing potential of the proposed action on each study region. AR 2623-31; AR 2657-69.[19] In

8    addition, the growth inducement analysis in the Final EIS was fully supported by an even more detailed

9    analysis on the subject in the Transfer EIR/EIS, which was incorporated by reference into the Final

10   EIS.[20]

11        The conclusion that there would be no growth-inducing impacts is especially reasonable in light

12   of the fact that the water transfer simply ***replaces*** 200 KAFY of low-priority existing supply with the

13   ***same amount*** of water from IID's more senior priority. AR 3050; *see also* AR 2667 ("Under the [IA],

14   SDCWA effectively would obtain water supplies from IID that it previously purchased from [MWD]").

15        Because it concludes that the analysis of growth-inducing impacts was reasonable and

16   supported by the record, the Court must defer to the agency under the arbitrary and capricious standard

17

18        [19] More specifically, the Final EIS notes that "[e]ach project component was evaluated as to its
     potential to induce population growth and impact current or future population and housing projections."
19   AR 2663. It also included responses to growth inducement-related comments from both Imperial County
     officials, AR 3050 (responding to a comment at AR 3046-47), and Defenders of Wildlife. AR 3073
20   (responding to a comment at AR 3062). The Final EIS summarized the effects of the No Action
     alternative on the region's population growth, noting that the southern California coastal plain had
21   experienced rapid population growth in the 1990s, and that projections for San Diego population,
     employment, and housing indicated "a continuation of current growth trends." AR 2663. The Final EIS
22   then examined the potential effects of the proposed action, and concluded that, "[i]mplementing the
     [proposed project] would not impact population, housing, or employment in the SDCWA service area."
23   AR 2667.

24        [20] For relevant excerpts from the Transfer EIR/EIS, see AR 5794; AR 5794-99 (analyzing the
     potential effects of the proposed project on population, water demand, and land use decisions in each
25   service area—including the SDCWA service area); AR 5794 (detailing the tests used to determine
     whether the IID-SDCWA water transfer would result in growth inducement); AR 5796 (with regard to
26   the SDCWA service area, "the Proposed Project would not have the potential to induce or deter greater
     economic development or population growth because it would not modify any future increases of water
27   supply that have already been planned and approved"); AR 5797 ("The Proposed Project would not
     involve any construction in the SDCWA service area, such as new water pipelines or aqueducts that
28   would facilitate population growth or open undeveloped areas to construction.")

1    of review. The Court DENIES Plaintiffs' motion for summary judgment and GRANTS Federal

2    Defendants' cross motion for summary judgment on this issue.

3         **5.    *Adequacy of Mitigation***

4              As a final NEPA argument, Plaintiffs claim the Final EIS and the Record of Decision failed to

5    identify adequate mitigation. NEPA requires an EIS to include measures to mitigate adverse environ-

6    mental impacts. 40 C.F.R. § 1502.16(h); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

7    351-52 (1989). Plaintiffs contend that the Final EIS "improperly deferred" to IID to address mitigation

8    for negative impacts. Plaintiffs also claim the Record of Decision was likewise defective because it did

9    not include mitigation that the Final EIS identified, or mitigation from the Transfer EIR/EIS upon which

10   the Final EIS relied.

11             An agency must discuss mitigation measures "in sufficient detail to ensure that environmental

12   consequences have been evaluated. . . . A mere listing . . . is insufficient." *Westlands Water Dist. v. U.S.*

13   *Dep't of the Interior*, 376 F.3d 853, 872 (9th Cir. 2004). However, a mitigation plan "need not be legally

14   enforceable, funded or even in final form . . . ."; rather, the court "need only be satisfied that the agency

15   took the requisite 'hard look' at the possible mitigation measures." *Okanogan Highlands Alliance v.*

16   *Williams*, 236 F.3d 468, 473 (9th Cir. 2000). An agency may incorporate by reference a more detailed

17   discussion of mitigation measures contained in another EIS, as the Final EIS did here. *See Ass'n of*

18   *Public Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1187 (9th Cir. 1997).

19   Further, it does not violate NEPA to acknowledge actions that local or state agencies could take to

20   mitigate impacts arising from a proposed action. *See Okanogan*, 236 F.3d at 477.

21             Here, each resource chapter in the Final EIS included a discussion of mitigation measures, in

22   which specific measures were identified.[21] For off-river impacts, the Final EIS summarized mitigation

23   measures identified by IID or other responsible California agencies, and referred readers to the more

24

25

26

_____

27        [21] *See, e.g.*, AR 2576 (citing biological conservation measures described at AR 2482-83)
     (hydrology); AR 2601-03 (biological resources); AR 2651-53 (agricultural resources); AR 2728-34 (air
28   quality).

1    detailed discussions in the Transfer EIS/EIS or the Coachella Valley WMP PEIR.[22] The mitigation

2    measures from the Final EIS that Department of Interior agencies would implement were appropriately

3    summarized in the Record of Decision, which also acknowledged the jurisdiction of QSA participating

4    agencies and the corresponding CEQA requirements for any mitigation within that jurisdiction. AR 10-

5    15. In doing so, the Record of Decision noted that it was not "federalizing" the QSA participating

6    agencies' mitigation measures, nor requiring supplemental NEPA compliance for those actions.

7    Importantly, Plaintiffs do not cite any authority supporting that this approach violated NEPA, and the

8    Court sees no reason why it would—keeping in mind that Plaintiffs' arguments regarding improper

9    incorporation by reference fail for the reasons stated above.

10        The Court therefore finds that the treatment of mitigation measures in the Final EIS and the

11   Record of Decision complied with NEPA. Plaintiffs' motion for summary judgment is DENIED, and

12   Federal Defendants' cross motion for summary judgment is GRANTED on this issue.

13                                          **IV.**

14                                    **CONCLUSION**

15        For the reasons set forth above, the Court concludes that Plaintiffs' claims fail for lack of

16   standing, which is sufficient to defeat Plaintiffs' motion for summary judgment in its entirety. The Court

17   also finds that Plaintiffs' NEPA claim fails on the merits. Because these findings are determinative and

18   none of Plaintiffs' claims survives, the Court declines to consider the additional arguments raised by

19   Intervening Defendants. The Court therefore **DENIES** Plaintiffs' motion for summary judgment,

20   **GRANTS** Federal Defendants' cross motion for summary judgment, and **DENIES AS MOOT**

21   Intervening Defendants' cross motion for summary judgment.

22        The Court directs the Clerk to enter judgment accordingly.

23   DATED:  April 6, 2012

24                                    _____

25                                    Hon. Anthony J. Battaglia
                                      U.S. District Judge

26

27        [22] *See, e.g.,* AR 2575, 2600-01 (IID's proposed HCP and associated SSHCS); AR 2640
     (mitigation of impacts to recreation at the Salton Sea); AR 2728-29 (mitigation of air quality impacts
28   within IID's and Coachella's service areas).

09cv2233